UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICK T. WOJTKOWIAK,

    Plaintiff

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

Civil Action No. 16-14296

HON. R. STEVEN WHALEN
U.S. Magistrate Judge

**OPINION AND ORDER**

Plaintiff Rick T. Wojtkowiak ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying his application for Supplemental Security Income ("SSI") under the Social Security Act. For the reasons discussed below, Defendant's Motion for Summary Judgment [Docket #24] is GRANTED and Plaintiff's Motion for Summary Judgment [Docket #18] is DENIED.

**I. PROCEDURAL HISTORY**

On August 23, 2013, Plaintiff filed an application for SSI, alleging disability as of July 27, 2013 (Tr. 162). After the initial denial of the claim, Plaintiff requested an administrative hearing, held on June 2, 2015 in Mt. Pleasant, Michigan before Administrative Law Judge ("ALJ") Kendra S. Kleber (Tr. 30). Plaintiff, represented by attorney Frank Paripilo, testified (Tr. 40-66), as did Vocational Expert ("VE") Donald Hecker (Tr. 67-72). On September 15, 2015, ALJ Kleber determined that Plaintiff was capable of a significant range of unskilled, light work (Tr. 13-25). On October 25, 2016, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the final decision in this Court on

December 9, 2016.

Oral argument on the parties' cross-motions for summary judgment was held on March 15, 2018

## II.  BACKGROUND FACTS

Plaintiff, born July 31, 1973, was 42 when ALJ Kleber issued her decision (Tr. 25, 162).  He completed a 11th grade and worked as a fish taxidermist (Tr. 190).  He alleges disability resulting from anxiety, Irritable Bowel Syndrome ("IBS") acid reflux, a herniated disc, depression, asthma, degenerative disc disease, cyst in left kidney, and spinal cysts (Tr. 189).

### A.  Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by noting that an earlier application for disability benefits was denied on April 27, 2012.  Counsel noted further that Plaintiff had been the recipient of a pacemaker a few months earlier but continued to experience shortness of breath and fatigue* (Tr. 36).

Plaintiff offered the following testimony:

He lived in Gaylord Michigan (Tr. 40).  He had not worked since 2013 at which time he was self-employed as a fish taxidermist (Tr. 40).  He was unable to work due to back pain and anxiety (Tr. 41).  As a result of anxiety, he was unable to cope with any level of workplace stress (Tr. 41).  He had not had worked full time since he was a teenager (Tr. 41).  The pacemaker had not improved his symptoms of shortness of breath, headaches, or heart palpitations (Tr. 42).  He continued to experience constant daytime fatigue (Tr. 42).  Although he experienced mild obstructive sleep apnea, his cardiologist directed him not to use a CPAP machine after the implantation of the pacemaker (Tr. 42-43). Neither his former use of the CPAP machine nor the pacemaker improved his condition (Tr. 43).

Physical therapy failed to improve his back condition (Tr. 44). He had been told that he was too young to undergo spinal surgery (Tr. 45). He denied that one of his treating sources ("Dr. McKenzie") told him to lose weight and exercise and been "very short" and "actually tried to hurry up and get done with the visit" (Tr. 46). Plaintiff's back pain was centered in his lower back but traveled into the hips and "sometimes" down the back of the left leg three to four times a month for an entire day (Tr. 47). The radiating pain was exacerbated by standing in one place (Tr. 48). On a typical day, he experienced level "7" pain on a 1 to 10 scale but 10 or more times a month was a 9 to 9.5 (Tr. 48). He coped with extreme back pain by reclining for an hour (Tr. 49). He was unable to sit for more than 30 minutes, stand for more than 15 minutes, or walk for more than two city blocks without experiencing back pain (Tr. 49). He experienced fatigue every day and for three days each week, experienced fatigue to the extent that returned to bed and slept for two hours (Tr. 50-51). He experienced level "4 to 5" level headaches every day (Tr. 51). His headaches were exacerbated by sunlight (Tr. 51). He coped with the headaches by taking over-the-counter medication and sleeping for up to two hours (Tr. 51).

Plaintiff had also been experiencing shortness of breath for around nine months (Tr. 52). The shortness of breath was brought on by walking (Tr. 53). Inhalers did not help the condition (Tr. 53). Despite back pain and headaches, he used only over-the-counter pain medication (Tr. 53). He also coped with back pain by lying on a flat surface for up to half an hour at a time (Tr. 54). His most comfortable position was sitting in a recliner with his feet up (Tr. 54). He spent more than five hours a day sitting in a recliner (Tr. 54). The pacemaker implantation was "still healing" and along with the back pain, caused nighttime sleep disturbances (Tr. 55). He took around three naps a week lasting anywhere between one and two hours (Tr. 56).

Due to fatigue, depression, and anxiety, Plaintiff experienced concentrational problems (Tr. 56). The condition of depression resulting in weekly crying jags and low self esteem (Tr. 56-57). He had experienced suicidal ideation recently but not at present (Tr. 57). He had seen a counsel once the previous week after an approximately 10-month hiatus (Tr. 57). He stopped counseling the previous year after his counselor told him that "there was nothing more than he could teach [him]" and that he "had to learn to deal with it" himself (Tr. 57-58). Since stopping treatment in August, 2014, his depression and anxiety had worsened (Tr. 59). He experienced anxiety while grocery shopping and had not shopped in the past two months (Tr. 60). He tried to shop when the store was not crowded (Tr. 60). His symptoms included a "fight or flight" response, nervousness, stuttering, and sweating (Tr. 61). He was unable to work with others due to shaking, sweating, and the feeling that everyone was staring at him (Tr. 62).

His regular activities included performing household chores for up to 15 minutes after which he would experience back pain (Tr. 62). He currently lived with his parents (Tr. 63). His parents cooked the meals and performed most of the outdoor chores although sometimes, Plaintiff attempted to help them for up to half an hour at a time (Tr. 63). He did not participate in social activities (Tr. 64). He denied problems with alcohol or drugs since the alleged onset of disability (Tr. 64). He stood 5' 9" and weighed 235 pounds (Tr. 65).

*The ALJ noted that while an August 11, 2010 MRI of the lumbar spine showed a disc herniation at L-5, a November, 2, 2013 MRI showed only "bulging discs"* (Tr. 65-66).

    **B.**    **Medical Evidence[1]**

    **1. Records Related to Plaintiff's Treatment**

---

[1] Records predating the alleged onset of disability date of June 27, 2013 are included for background purposes only.

A November, 2010 MRI of the lumbar spine showed a disc herniation at L4-L5 displacing the nerve roots (Tr. 247). A small herniation at L5-S1 showed no dramatic change since a previous study (Tr. 247). October, 2012 treating records note an increase in Plaintiff's dosage of Zoloft (Tr. 250). The following month, Plaintiff reported mild chest pain and a headache but admitted that he hot a four-point buck the previous week "an dragged it out of the woods" with "no problem" (Tr. 255). A musculoskeletal examination was normal with normal muscle strength and tone (Tr. 256).

July, 2013 records state that despite a respiratory infection, Plaintiff's mental and physical condition was otherwise unremarkable (Tr. 261-262). The following month, six days after filing an application for SSI, Plaintiff requested a referral to an orthopedic surgeon (Tr. 263). October, 2013 imaging studies of the lumbar spine showed only mild degenerative changes (Tr. 287). Records by Gary L. Lingaur, M.D. note that Plaintiff was alert and not in distress (Tr. 288-289). A November, 2013 MRI of the lumbar spine found bulging at L4-L5 and L5-S1 without significant nerve root impingement (Tr. 264, 290). The same month, Plaintiff reported that back pain interfered with some daily activities (Tr. 291). The following month, orthopedic surgeon Adrienne M. Kelly, M.D. noted Plaintiff's denial of radiating back pain, tingling, or numbness (Tr. 293). Plaintiff reported that he was limited to walking 200 yards (Tr. 294). Dr. Kelly noted that Plaintiff did not appear uncomfortable and was fully oriented (Tr. 296). She noted a "normal but tentative" gait with feel and toe walking (Tr. 295). She reviewed the MRI from the previous month (Tr. 297). She noted that Plaintiff was reconditioned and recommended physical therapy (Tr. 298). She declined to recommend "formal restrictions on . . . activities" (Tr. 298, 444).

In January, 2014, Dr. Linguar noted that Plaintiff, a longstanding patient, had experienced anxiety for over 20 years (Tr. 299). A January, 2014 psychological intake

assessment note that Plaintiff recently received a preliminary denial of SSI benefits (Tr. 278, 302). Plaintiff reported that he was depressed due to financial constraints and his anxiety around others (Tr. 278). He reported that neurological surgeons did "not want to touch" his back "because it would likely just make it worse" (Tr. 278). He reported interrupted sleep and that he spent his days sitting in a recliner, watching television, and playing on his cell phone (Tr. 278). He refused to go to funerals and had "struggled" recently going into stores (Tr. 278). He reported good relationships with others (Tr. 278). He reported that he had been taking Zoloft for 10 years (Tr. 279). Plaintiff appeared appropriate but depressed (Tr. 279). He reported "moderately impaired" concentration (Tr. 279). His social judgment was deemed "adequate (Tr. 280). Plaintiff admitted that he had been offered training in taxidermy but turned it down because of back pain and anxiety (Tr. 282). He was referred for individual and group therapy (Tr. 283). The following month, Plaintiff reported blood in his stool for three days (Tr. 309, 508, 541, 544).

In March, 2014, was prescribed Ranitidine and Prilosic for gastrointestinal discomfort (Tr. 213). The same month, Joseph Moore, MA completed a mental impairment questionnaire, noting that he had seen Plaintiff four times since January, 2014 (Tr. 631). He noted Plaintiff's report of frequent panic attacks and depression (Tr. 631). Moore found that Plaintif "may be able to build a tolerance to" being in public "social situations" (Tr. 631). He noted the presence of concentrational problems, apprehension, withdrawal, maladaptive patterns of behavior, memory impairment, and recurrent and severe panic attacks at least once a week (Tr. 632). He found that Plaintiff was unable to meet compretititve standards in working in coordination with others and completing a normal workday (Tr. 633). He found marked limitation in social functioning (Tr. 635). He noted that the panic attacks "and challenges in social settings will make some employment settings nearly impossible for him

to be successful in if his treatment does not produce results" (Tr. 634). April, 2014 records by Dr. Kelly note that Plaintiff denied sleep disturbances (Tr. 447). April, 2014 records by James R. MacKenzie, M.D. note that a recent GI work up had been mostly unremarkable (Tr. 321). Dr. MacKenzie recommended that Plaintiff restart physical therapy, noting that Plaintiff was "decondition[ed]" (Tr. 322). Dr. MacKenzie found that neither surgery nor injections were warranted (Tr. 323). A June, 2014 biopsy report of the duodenum was unremarkable (Tr. 331). The following month, Plaintiff reported intermittent constipation and diarrhea (Tr. 332). An ultrasound of the abdomen was unremarkable except for fatty infiltration of the liver (Tr. 334).

An August, 2014 discharge summary states that Plaintiff was becoming more involved with friends and family "especially" fishing (Tr. 284). Plaintiff reported that he was looking forward to hunting season (Tr. 284). He stated that he did not think that he was ready for full time employment (Tr. 284). Plaintiff reported that he was happy with the counseling services provided (Tr. 284). The following month, he reported chest heaviness (Tr. 531, 498, 554). Imaging studies of the heart were unremarkable (Tr. 337, 347). A stress test was also negative (Tr. 343, 421-422, 523-524, 556). A CT of the chest was normal (Tr. 365, 494, 591).

January, 2015 records note a normal gait and station (Tr. 368, 476). A polysomnogram from the following month showed obstructive sleep apnea (Tr. 374, 487). March, 2015 records by Dr. Linguar note Plaintiff's report of panic attacks (Tr. 377). Dr. Linguar noted normal judgment and insight (Tr. 378). Respiratory testing from the same month was normal (Tr. 387, 390, 480). The same month, records by cardiologist Linda K. Gossett, M.D. state that Plaintiff was interested in undergoing a cardiac catheterization (Tr. 393, 406). The same month, the condition of sleep apnea was deemed "mild" (Tr. 462).

Catherterization records from the following month show no abnormalities (Tr. 397, 417). Plaintiff reported that he "may need a pacemaker" (Tr. 458). A CT of the chest was unremarkable (Tr. 655). Plaintiff reported that he was currently looking for work (Tr. 656). Cardiologist Peter Levanovich, M.D. noting the presence of heart palpitations, recommended a permanent pacemaker (Tr. 658-659). Plaintiff underwent the implantation of a dual-chamber pacemaker on April 30, 2015 (Tr. 666). The following month, Plaintiff turned in his CPAP device, stating that he was unable to sleep comfortably at night due to a pacemaker and that he did not like using a full face mask (Tr. 640). Followup records state that Plaintiff reported "good symptom control" from the pacemaker but continued to complain of "fatigue and fuzzy head" (Tr. 651).

On May 29, 2015, Moore composed a letter, stating that "[b]ecause of [Plaintiff's] anxiety in social settings, he may struggle while attempting to participate" at the upcoming disability hearing (Tr. 698).

### 2. Non-Treating Sources

A November, 2013 consultative examination records by Thuy Nguyen, D.O. note Plaintiff's report of low back pain radiating into the bilateral lower extremities (Tr. 265). He did not require an assistive device and had not seen a spine surgeon, had physical therapy, or had steroid injections (Tr. 265). He denied manipulative limitations (Tr. 265). He reported that he was unable to walk more than 75 yards due to asthma (a 20-year history) but denied emergency visits or hospitalizations (Tr. 265). Dr. Nguyen noted that Plaintiff walked with a limp (Tr. 266). Plaintiff reported a diagnosis of IBS (Tr. 266). Plaintiff exhibited normal judgment and insight (Tr. 266). He demonstrated full muscle and grip strength (Tr. 266). Neurological testing results were normal (Tr. 266). Range of motion studies were

unremarkable (Tr. 267-268).

The same day, Paul D. Winkler, PsyD performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of sleep disturbances, chronic pain, and stress due to finances, health, anxiety in public places, and feelings of helplessness and worthlessness (Tr. 272). Plaintiff reported good relationships with his parents and middle brother (Tr. 272). He reported that he had a limited group of friends but got along well with others (Tr. 272). He reported that his main supports were his parents, brother, one close friend, and his former girlfriend's mother and other family members (Tr. 272). Dr. Winkler noted that Plaintiff was cooperative, pleasant, socially appropriate, and well groomed (Tr. 273). He acknowledged suicidal ideation in the past on one occasion but that he then called on a friend for support (Tr. 273). He noted that Plaintiff appeared "mildly labile but appropriate" with an anxious mood "with depression in the background" (Tr. 273). Plaintiff appeared fully oriented with a normal memory (Tr. 273). Dr. Winkler noted that counseling would be "helpful" (Tr. 274). He concluded that Plaintiff had a "poor" prognosis and had "very limited to no[]" task capabilities due to a "combination of medical and emotional" problems (Tr. 275).

In December, 2013, Buce G. Douglass, Ph.D. performed a non-examining psychological assessment, finding that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 107). He noted that Dr. Winkler's "poor" prognosis stood at odds with the consultative observations of full orientation, good motor skills, and good results on the mental capacity portion of the exam (Tr. 106).

### C. Vocational Expert Testimony

VE Hecker testified that Plaintiff had no past relevant work(Tr. 68). The ALJ then

posed a set of restrictions to the VE, describing a hypothetical individual of Plaintiff's age, education, and lack of work history:

> [T]his worker is able to lift or carry 20 pounds occasionally or 10 pounds frequently; able to stand or walk for six hours out of eight or to sit for six hours out of eight; is able to perform [work] that requires him to occasionally climb stairs or ramps but not ladders or scaffolds.[2] He's frequently able to balance on a moving platform and occasionally able to stoop or kneel or crouch or crawl. He's able to perform work that does not involve exposure to vibration or to hazards, such as unprotected heights or uncovered industrial machinery; is able to perform simple, routine, repetitive tasks that involve no interaction with the public; occasional interaction with coworkers. Basically, he would work best in isolation or within a small, familiar group? (Tr. 68).

The VE found that the above restrictions woul allow for the light, unskilled work of a night office cleaner (260,000 positions in the national economy); packer (280,500); and inspector/checkers (248,000) (Tr. 69). The VE testified further that if the same individual were additionally limited by walking for no more than 60 minutes at a time and only superficial contact with coworkers, the job numbers would be unchanged (Tr. 70).

In response to questioning by Plaintiff's counsel, the VE stated that the need to be off task at least 20 percent of the workday, take more than two absences each month, or, elevate his legs to hip level for two hours of the workday, all competitive work would be eliminated (Tr. 71). He stated that his testimony was consistent with the *Dictionary of Occupational Titles* ("*DOT*") except for the testimony regarding time off task and workday absences, which was based on his own professional experience (Tr. 67). He stated further that the

---

[2] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work " lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

hypothetical limitations would allow for the light, unskilled work of a small products assembler (150,000 in the national economy); packer (35,000); and office cleaner (250,000) (Tr. 68).

### D. The ALJ's Decision

Citing the medical transcript, ALJ Kleber found that Plaintiff experienced the severe impairments of degenerative disc disease of the lumbar spine, affective disorder, anxiety disorder, sleep apnea, obesity, and heart block but that none of the conditions met or medically equaled an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 16-17). She found that the conditions of headaches, osteoarthritis, and IBS were non-severe (Tr. 16). She found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 18). The ALJ determined that Plaintiff retained the Residual Functional Capacity ("RFC") for light work with the following limitations:

> [L]ift or carry up to 20 pounds occasionally or 10 pounds pounds frequently. He can stand or walk up to six hours of an eight-hour workday for 60 minutes at a time, with a five-minute rest. He can sit up to six hours of an eight-hour workday. He can occasionally climb stairs or ramps, but not ladders or scaffolds. He can frequently balance on a moving platform, and can occasionally stoop, crouch, crawl, or kneel. The work he can perform does not involve exposure to vibration, or exposure to hazards such as unprotected heights or uncovered industrial machinery. Finally, Mr. Wojtkowiak can perform simple routine repetitive tasks in an environment involving no interaction with the public and have no or insignificant contact with coworkers (Tr. 19).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the unskilled, light work of a night office cleaner, packer, and inspector/checker (Tr. 24, 69).

The ALJ discounted Plaintiff's allegations of disability, noting that Plaintiff spent time with family and close friends by talking online or by telephone (Tr. 20). She noted Plaintiff was able to drive and shop for groceries (Tr. 20). The ALJ cited treating notes showing that

within the year preceding the alleged onset of disability, Plaintiff was able to shoot a four-point buch and drag it out of the woods (Tr. 20). The ALJ observed that a November, 2013 MRI of the lumbar spine did not show significant verve root impingement and that Plaintiff had not seen a spine surgeon, received physical therapy, or had epidural injections (Tr. 20). She cited April, 2015 records showing a normal gait and full muscle strength (Tr. 21).

The ALJ accorded "little weight" to Dr. Winkler's consultative conclusion that Plaintiff had "very limited" to no ability to complete tasks due to physical and mental problems, noting that the conclusion was inconsistent with Dr. Winkler's clinical observations (Tr. 21). She also assigned little weight to Moore's finding of marked limitation in social functioning, noting that the finding was inconsistent with Moore's report that Plaintiff might be capable of building a tolerance to social situations (Tr. 22). She assigned "great weight" to Dr. Douglass' non-examining finding of only moderate limitation in social functioning and concentration, persistence, or pace (Tr. 22-23).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  CONCLUSION

For the reasons stated on the record on March 15, 2018, Plaintiff's motion for summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: March 19, 2018

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on March 19, 2018, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen